1    KEKER, VAN NEST & PETERS LLP
     AJAY S. KRISHNAN - # 222476
2    akrishnan@keker.com
     MICHAEL S. KWUN - # 198945
3    mkwun@keker.com
     KHARI J. TILLERY - # 215669
4    ktillery@keker.com
     EDUARDO E. SANTACANA - # 281668
5    esantacana@keker.com
     633 Battery Street
6    San Francisco, CA 94111-1809
     Telephone: 415 391 5400
7    Facsimile: 415 397 7188

8    Attorneys for Defendant SHANGHAI MOONTON
     TECHNOLOGY CO., LTD

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIOT GAMES, INC., a Delaware corporation, | Case No. 2:17-cv-4986 MWF (SS$_X$) |
| Plaintiff, | **DEFENDANT MOONTON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR A DISMISSAL OR STAY PURSUANT TO THE DOCTRINE OF FORUM NON CONVENIENS** |
| v. | |
| SHANGHAI MOONTON TECHNOLOGY CO., LTD., and DOES 1-10, inclusive, | Date:  December 4, 2017. Time:  10:00 a.m. Dept.:  5A Judge:  Hon. Michael W. Fitzgerald |
| Defendants. | Date Filed: July 6, 2017 |
| | Trial Date:  Not Assigned |

REDACTED VERSION OF DOCUMENT

PROPOSED TO BE FILED UNDER SEAL

---

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   BACKGROUND ......................................................................... 2

    A.    Many MOBA games share common features. ........................ 3

    B.    Tencent, Riot, and Moonton have filed related lawsuits. .................... 4

        1.    Tencent filed suit first, in China. ................................. 5

        2.    Riot's U.S. lawsuit contradicts Tencent's Chinese lawsuit. ........ 6

        3.    Tencent and Moonton have filed other lawsuits in China. .......... 7

        4.    Tencent has filed more than ten copyright and trademark lawsuits in China, on behalf of Riot, relating to *LoL.* ............... 7

    C.    Tencent's interests appear to be driving Riot's lawsuit. ...................... 7

    D.    Riot's *Magic Rush* claim is also timed to help Tencent. ..................... 8

    E.    The case involves Chinese-language witnesses and documents located in China. ...................................................... 8

III.  ARGUMENT ............................................................................ 10

    A.    Legal standard ............................................................ 10

    B.    Tencent and Riot's litigation conduct confirms that China is an adequate alternative forum. ................................................ 11

    C.    The private interest factors favor dismissal. ........................ 12

        1.    The first private interest factor—residence of the parties and witnesses—weighs heavily in favor of dismissal. ............. 13

        2.    The second private interest factor—convenience of the forum to the litigants—weighs heavily in favor of dismissal. ................................................. 15

        3.    The third private interest factor—access to physical evidence and other sources of proof—weighs heavily in favor of dismissal. ................................................ 16

        4.    The fourth private interest factor—whether unwilling witnesses can be compelled to testify—weighs heavily in favor of dismissal. ...................................... 16

        5.    The fifth factor—the cost of bringing witnesses to trial—weighs heavily in favor of dismissal. ....................... 17

i

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

6.   The sixth factor—the enforceability of the judgment—weighs in favor of dismissal. ...................................................18

7.   The seventh factor—all other practical problems that make trial of a case easy, expeditious and inexpensive—weighs strongly in favor of dismissal. ......................................18

D.   Riot's choice of a U.S. forum receives reduced deference. ...............20

1.   Riot's forum choice receives reduced deference because it was driven by factors other than convenience. ........................21

2.   Riot's forum choice receives reduced deference because its Chinese interests, at least in part, are driving this litigation. .........................................................................22

3.   The balance of private interest factors outweigh any deference to Riot's forum choice. ...........................................23

E.   Public Interest Factors ..........................................................................24

1.   The first public interest factor—local interest in the lawsuit—weighs in favor of dismissal. ..................................24

2.   The second public interest factor—the court's familiarity with governing law—either is neutral or weighs in favor of dismissal. .........................................................................24

3.   The third public interest factor—the burden on local courts and juries—weighs in favor of dismissal. ...................24

4.   The fourth pubic interest factor—congestion in the court—weighs in favor of dismissal. ........................................25

5.   The fifth public interest factor—the costs of resolving a dispute unrelated to the forum—is neutral. .............................25

IV.   CONCLUSION ............................................................................................25

1199898

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### Federal Cases

4

*Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*
  69 F.3d 381 (9th Cir. 1995) ................................................................18, 24

5

*Apple Computer, Inc. v. Microsoft Corp.*
6
  35 F.3d 1435 (9th Cir. 1994) ......................................................................14

7

*Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.,*
  61 F.3d 696 (9th Cir. 1995) ...................................................11, 12, 19, 22

8

*Facebook, Inc. v. Studivz Ltd.*
9
  No. 08-3468-JF, 2009 WL 1190802 (N.D. Cal. May 4, 2009) ..........................22

10

*Fresh Pac Int'l, Inc. v. Gowan Group*
  No. 16-cv-539-GPC, 2016 WL 4563716 (S.D. Cal. Sept 1, 2016) ....................19

11

*Gates Learjet Corp. v. Jensen*
12
  743 F.2d 1325 (9th Cir. 1984) ....................................................................25

13

*Globatrac LLC v. JB Squared Ltd.*
  Case No. 15-cv-9278-MWF, 2016 WL 9045479 (C.D. Cal. 2016) ............*passim*

14

*Leetsch v. Freedman*
15
  260 F.3d 1100 (9th Cir. 2001) ..............................................................12, 13

16

*Lockman Found. v. Evangelical Alliance Mission*,
  930 F.2d 764 (9th Cir. 1991) ...........................................12, 17, 19, 20

17

*Lueck v. Sundstrand Corp.*
18
  236 F.3d 1137 (9th Cir. 2001) ..........................................11, 12, 13, 17

19

*Mazer v. Stein*
  347 U.S. 201 (1954) ....................................................................................14

20

*Meridian Seafood Prods., Inc. v. Fianzas Monterrey, S.A.*
21
  149 F.Supp.2d 1234 (S.D. Cal. 2001) ........................................15, 22, 23

22

*Nai-Chao v. Boeing Co.*
  555 F.Supp. 9 (N.D. Cal. 1982) ................................................................20

23

*Piper Aircraft Co. v. Reyno*
24
  454 U.S. 235 (1981) .............................................................11, 12, 22

25

*Ranza v. Nike,*
  793 F.3d 1059, 1076–77 (9th Cir. 2015) .................................................21

26

*Sandoval v. Carnival Corp.*
27
  No. 12-5517-FMO, 2014 WL 12585803 (C.D. Cal. Sept. 15, 2014) ................19

28

iii

1199898

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*
   549 U.S. 422 (2007) ......................................................................11, 19

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*
   482 U.S. 522 (1987) ............................................................................16

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*
   24 F.3d 1088 (9th Cir. 1994) ..............................................................15

*Vivendi SA v. T-Mobile USA Inc.*
   586 F.3d 689 (9th Cir. 2009) ........................................................17, 21

**Federal Rules**

Fed. R. Civ. P. 45...................................................................................16

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

I.   **INTRODUCTION**

Defendant Moonton[1] respectfully requests that the Court dismiss or stay this lawsuit under the *forum non conveniens* doctrine, so that Plaintiff Riot—a wholly-owned subsidiary of Chinese mega-corporation Tencent—can pursue this action in China, the far more appropriate forum.

This lawsuit is part of a larger battle between two Chinese companies: Tencent, the fifth largest Internet company in the world, and Defendant Moonton, a small videogame start-up.  Tencent is attempting to crush its smaller competitor through parallel (and unmeritorious) copyright litigation.  In March 2017, Tencent sued Moonton in China for copyright infringement.  Nearly four months later, Riot filed this copyright and trademark infringement action against Moonton.  Moonton vehemently disputes liability in both cases.

Nonetheless, this parallel litigation strategy is an abuse of the court system.  Tencent's and Riot's allegations are completely inconsistent.  Each claims to have independently created the same videogame map, and each claims that Moonton copied its map.  This is impossible.  By splitting the proceedings across two continents and two languages, Tencent and Riot seek to get away with inconsistent positions, double Moonton's legal fees, and threaten Moonton with a potential double recovery of damages.

To make matters worse, litigation in the United States will be unfair and inefficient.  Evidence critical to Moonton's defenses resides with Chinese third parties, like Tencent, who are beyond this Court's subpoena power.  Also, key testimony and documents will be in Chinese.  Credibility determinations are difficult with translated testimony, and translation itself will be expensive.  Indeed, translation costs alone will exceed the entire cost of litigating this case in China.

---

[1] "Moonton" refers to Defendant Shanghai Moonton Technology Co., Ltd., and its subsidiaries.  "Riot" refers to Plaintiff Riot Games, Inc.  "Tencent" refers to the Chinese entity Tencent Holding Ltd., and its Chinese subsidiaries.

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

Perhaps the greatest inefficiency of this lawsuit is that, even if Riot were to prevail, it could only recover a small fraction of its damages for worldwide distribution of Moonton's game through this lawsuit.  The vast majority ▮▮▮▮ of Moonton's revenues derive from foreign users—that is, through extra-territorial distribution that falls outside the scope of U.S. copyright law.

China is a far better venue for this dispute.  Tencent itself contends that a Chinese court could award damages for 100% of Moonton's worldwide game distribution.  China is a convenient forum for Riot: within the last three years, Tencent has brought over ten copyright and trademark lawsuits on behalf of Riot in China.  Moreover, a Chinese court—with access to all relevant evidence—can keep Tencent and Riot honest by ensuring that they do not take inconsistent positions or seek a double recovery.

The *forum non conveniens* doctrine prevents exactly the type of injustice and inefficiency presented by this lawsuit.  Tencent chose to initiate this dispute against Moonton in China.  Tencent's subsidiary should not be allowed now to seek the same damages in the United States on a factually inconsistent legal theory, and through an enormously inefficient lawsuit.  Accordingly, Moonton requests a *forum non conveniens* dismissal or stay of this lawsuit in favor of a Chinese forum.

## II.  BACKGROUND

There are three parties to this dispute: Tencent, Riot, and Moonton.  Only Riot and Moonton are parties to this case.

Plaintiff Riot Games is a wholly-owned U.S.-based subsidiary of Tencent.[2]  Tencent is a Chinese corporation.  It is the world's fifth largest Internet company (Facebook is number 4), with a variety of businesses, including video games.[3]

---

[2] https://www.riotgames.com/articles/20151215/2132/riot-comp-changes-incoming.
[3] https://en.wikipedia.org/wiki/List_of_largest_Internet_companies; https://www.tencent.com/en-us/system.html.

2

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

Defendant Moonton is a small Chinese mobile game developer.  Mao Decl.,[4] ¶3.  Moonton is entirely based in China.  *Id.*  It has no business presence in the United States: no facilities, no employees, and no U.S. subsidiaries.  *Id.*

A.    **Many MOBA games share common features.**

This is a case about multiplayer online battle arena ("MOBA") games.  In MOBA games, two teams of players try to destroy the other team's base while protecting their own.  The market for MOBA games is crowded, with many games sharing a number of fundamental game rules and components.  For instance, below are (1) a "typical" MOBA map (from Wikipedia), and (2) the map from *Defense of the Ancients* ("*DotA*"), an early MOBA game from 2002:[5]





**"Typical" MOBA map from Wikipedia**                **Mini-map from DotA (2002)**

In this typical layout, bases occupy opposite corners of a square map, and three lanes emanate from each base.  Each lane has three defensive turrets (depicted by the blue and red dots) per team.  The diagonal represented by the dotted line is a fourth lane, typically occupied by a river.  The river and middle lane divide the into four jungle quadrants.  These are a few of the standard features of MOBA games.[6]

---

[4] "Mao Decl.," "Krishnan Decl.," and "Papageorgiou Decl.," refer, respectively, to the concurrently filed declarations of Yanhui Mao, Ajay Krishnan, and Elliot Papageorgiou in support of this Motion.

[5] https://en.wikipedia.org/wiki/Multiplayer_online_battle_arena; Mao Decl., ¶ 4.

[6] *See also* https://venturebeat.com/2014/09/01/the-history-of-mobas-from-mod-to-sensation/view-all/; http://www.escapistmagazine.com/forums/read/9.390989-A-Friendly-MOBA-Primer-A-How-To-Guide.

1199898

Tencent, Riot, and Moonton all have MOBA games.  Riot's game is *League of Legends* ("*LoL*") and Tencent's is *King's Glory*.  Mao Decl., ¶5.

Moonton's MOBA games have changed over time.  *Id.*, ¶6.  Moonton first released *Mobile Legends*: *5v5* ("*5v5*") on July 11, 2016, only on the Brazilian Google Play store (*i.e.*, Google's app store for Brazil).  *Id.*  On August 19, 2016, Moonton changed the name to *Mobile Legends:eSports MOBA* ("*eSports*").  *Id.*  On October 11, 2016, Moonton re-released it as *Mobile Legends: Bang Bang* ("*Bang Bang*").  *Id.*, ¶9.  *Bang Bang* was first released in the U.S. on October 31, 2016.  *Id.*

Moonton co-developed these MOBA games with a separate company, Shanghai Mulong Network Technology, Ltd. ("Mulong").  Until August 2016, Mulong had primary responsibility for the software programming and art design in the *Mobile Legends* games.  *Id.*, ¶7.  Moonton and Mulong spent millions of dollars and thousands of hours on engineering and art design for these games.  *Id.*, ¶10.

The above-identified standard features of MOBA games, among others, were part of the MOBA genre long before Riot released *LoL* in 2009.  *Id.*, ¶4.  Such features are also mostly common to *LoL*, *King's Glory*, and *Bang Bang*.  Indeed, over forty MOBA games are commercially available, many of which contain these features, and new ones are released frequently.  *Id.*, ¶5.

Riot's game, *LoL*, is a PC game (for desktop and laptop computers), whereas *King's Glory* and *Bang Bang* are mobile games.  *Id.*  Mobile games display on smaller screens, use less processing power, and have different user interfaces (*i.e.*, a touchscreen instead of a mouse and keyboard).  Thus, while Tencent and Moonton have competing mobile MOBA games, neither competes with Riot's *LoL* PC game.

B. **Tencent, Riot, and Moonton have filed related lawsuits.**

The first-filed lawsuit in the parties' dispute is Tencent's March 2017 action against Moonton in China.  Four months later, Riot filed this action.  Tencent and its subsidiary Riot take completely inconsistent positions in these lawsuits.

1199898

### 1.     Tencent filed suit first, in China.

In March 2017, Tencent filed a copyright claim against Moonton and Mulong in China's Shenzhen Intermediate People's Court alleging that *Bang Bang* infringes Tencent's copyright in *King's Glory*.  Mao Decl., ¶15 & Ex. A.  Tencent's complaint claims that it is the ***sole*** owner and developer of *King's Glory*, that it "independently conceived and developed" *King's Glory*, and that Tencent "possesses complete copyright of the '*King's Glory*' game software and all the intra-game elements, including but not limited to game maps, character images, game scenes, props and equipment, user interfaces, icons and other artworks, music, animations, [and] videos." *Id.* at 2.  The complaint further alleges that the "work elements of the game '*King's Glory*' have been acquired through research, development and innovation with huge cost from [Tencent]." *Id.* at 4.

Tencent's Chinese lawsuit alleges that *Bang Bang* is a copy of *King's Glory*. Tencent asserts that *Bang Bang's* "login interface, game maps, game interfaces, heroic images, heroic skills, equipment icons, introduction of features, summoner spell icons, and skill expression . . . are identical to the corresponding game elements of . . . *King's Glory*." *Id.* at 3.  The complaint accuses *Bang Bang*'s game map of "copying and adapting the art works" of *King's Glory*. *Id.* at 4.  Tencent seeks *worldwide* damages—for distribution in 42 countries, including the U.S.—in the amount of roughly $1.5 million (U.S.). *Id.* at 2, 6.

Tencent has also asked Apple to take down *Bang Bang* from the App Store based on Tencent's infringement claims.  In a letter to Apple, Tencent has identified visual elements in *Bang Bang* that it believes were copied from *King's Glory*.  Mao Decl., ¶16 & Ex. J.  Bizarrely, Tencent also attempted to use the existence of this lawsuit by Riot as a basis for Apple to take down *Bang Bang*. *Id.*, Ex. I at 3–4 (July 11, 2017 email from theoyi@tencent.com).  Apple has not acted on Tencent's request.

5

1199898

2.  **Riot's U.S. lawsuit contradicts Tencent's Chinese lawsuit.**

In July 2017, Riot filed this lawsuit claiming that Moonton's *5v5* and *Bang Bang* games infringe Riot's copyright in *LoL*.  With respect to *Bang Bang*, Riot's copying claim is limited to the game map.  Dkt. 1 ("Compl."), ¶29.

Riot claims that the *Bang Bang* map is "nearly identical" to the *LoL* map.  Compl., ¶29.  It also identifies seven particular elements that Riot alleges are the "exact same" in *Bang Bang* and *LoL*: "obstacles, objects, monsters, bases, turrets, textures, and overall color palate."  *Id.*

Notably, these seven elements are the same types of visual elements that Riot's corporate parent Tencent claims are infringing.  Mao Decl., Ex. J. & Compl., ¶29 (equivalent visual elements claimed by Tencent and Riot include: "obstacles/walls" (*i.e.*, "obstacles"); "the bushes" and "the left rock" (*i.e.*, "objects"); "positions" of bases, turrets, and monsters on the mini-map (*i.e.*, "monsters, bases, turrets"); "grains of the path" (*i.e.*, "textures"); "general design and colors" (*i.e.*, "overall color palates")).

Nowhere does Riot explain how it and its parent Tencent each independently developed games that are both allegedly "nearly identical" to *Bang Bang*.  Notably, neither Tencent nor Riot accuses Moonton of copying source code.  They allege only visual similarities between the three games.  *See, e.g.*, Compl., ¶29.

Moonton's many defenses to this lawsuit include: (1) that Riot purports to own either uncopyrightable rules or stock MOBA features that predated *LoL*; (2) that Moonton has not infringed the copyrightable portions of *LoL*; (3) that Tencent contradicts Riot's claim of originality; and (4) that many allegedly infringing acts (*e.g.*, conduct in China, foreign sales) are extraterritorial.  Moonton has explained some of these defenses to Apple, as Riot, like Tencent, has asked Apple to take down Moonton's game.  Krishnan Decl., ¶¶5–7 & Exs. A–C.

Finally, Riot also alleges trademark infringement and false designation of origin claims against Moonton.  Compl., ¶¶46–59.  Riot asserts numerous U.S.

6

trademarks.  *Id.*, ¶18.  Riot owns identical English trademarks registered in China.  Krishnan Decl., ¶8 & Ex. D.   The scope of Riot's trademark claim is vague, and is the subject of Moonton's pending motion to dismiss.  Dkt. 14.

3.    **Tencent and Moonton have filed other lawsuits in China.**

There are two other lawsuits relating to Moonton's dispute with Tencent.  Tencent has sued Moonton founder Xu Zhen Hua for alleged violation of a non-compete agreement.  Mao Decl., ¶17.  Additionally, in July 2017, Moonton sued Tencent in China for misusing its copyright to stifle competition.  *Id*.

4.    **Tencent has filed more than ten copyright and trademark lawsuits in China, on behalf of Riot, relating to *LoL*.**

Tencent has sued for infringement of *LoL* copyrights or trademarks no fewer than ten times in China, as Riot's licensee.  *Id*., ¶¶18–20 & Exs. C–G.  The defendants in those cases were also Chinese game developers.

C.    **Tencent's interests appear to be driving Riot's lawsuit.**

The timeline of Riot's conduct suggests Tencent, not Riot, is driving this lawsuit.  On July 11, 2016, Moonton first released *5v5* on the Brazilian Google Play Store.  Mao Decl., ¶6.  Shortly thereafter, Riot complained to Google that *5v5* infringed Riot's copyright and trademark.  *Id.*, ¶8.  In response, Google took down *eSports* on August 24, 2016.  *Id*.  Moonton changed the design of *eSports* and re-posted it on September 9, 2016.  *Id*.

***For the next ten months, Riot stopped complaining.***  *Id*.  During those ten months, Tencent—not Riot—accused *Bang Bang* of copyright infringement.  *Id*.  Starting in October 2016, Tencent contacted Moonton, alleging that *Bang Bang* infringed Tencent's copyright in *King's Glory*.  *Id.*, ¶14.  Discussions between Tencent and Moonton continued for months.  *Id*.  Riot was never involved.  In March 2017, Tencent filed its copyright claim against Moonton in China.  *Id.*, ¶15.  And still, there was radio silence from Riot.  Finally, in July 2017—four months

after Tencent filed suit—Riot filed here.[7]  Dkt. 1.  In other words, Riot appears to have been satisfied with the re-design of Moonton's game, and only filed this suit after Tencent decided to sue in China.

### D.  **Riot's *Magic Rush* claim is also timed to help Tencent.**

Most of Riot's complaint pertains to *Magic Rush*, even though Riot does not claim that it currently infringes.  Compl., ¶¶19–23, 31–37.  *Magic Rush* is not a MOBA game.  In *Magic Rush*, a player controls a band of heroes as they advance through various settings (*e.g.*, castles, caves, fields, etc.) to defeat an invading force.  Mao Decl., ¶11.  This is different from a MOBA game.  For instance, in MOBA games, there is one game map (not many); the player controls one character (not many); and the player controls the characters' attacks and maneuvers (whereas in *Magic Rush*, these are mainly computer-controlled).  *Id.*  Moonton developed *Magic Rush*, but a separate Chinese company, Elex, distributed it worldwide.  *Id.*, ¶ 12.  In March 2016, Riot complained that a collection of 14 out of 57 characters in *Magic Rush* infringed Riot's copyright in *LoL*.  *Id.*.  Riot and Elex negotiated certain changes.  *Id.*  By November 2016, Riot had no further complaints.  *Id.*  After nine months of silence, Riot filed this lawsuit.  Dkt. 1.  Again, the timing suggests that Riot never would have filed this case but for Tencent's dispute with Moonton.

### E.  **The case involves Chinese-language witnesses and documents located in China.**

Four categories of witnesses—all of whom possess relevant documentary evidence—reside in China, outside this Court's subpoena power.

One critical Chinese witness is Tencent.  As discussed above, Tencent has effectively alleged that it developed a map that is virtually identical to the *LoL* map.  If true, this would be critical to Moonton's defenses relating to lack of originality,

---

[7] Riot apparently recognizes that this chronology looks bad.  In an attempt to cure it, Riot implies—***but never expressly states***—that it was unaware Moonton re-posted the game in September 2016.  Compl., ¶3.  But, of course Riot must have known, since its parent company was alleging infringement in *Bang Bang* beginning in October 2016.  Mao Decl., ¶14.

non-infringement, scenes à faire, merger, and damages.  *See infra* § III.C.1.  All of Tencent's relevant witnesses—*i.e.*, those who developed *King's Glory*—are based in Shenzen or Chengdu, China.  Mao Decl., ¶¶21–22 & Ex. H.

A second important Chinese witness is Mulong, the company primarily responsible for developing Moonton's *5v5* and portions of *Bang Bang*.  In August 2016, when Riot first complained to Google about copyright infringement in *5v5*, most of the game's art design was Mulong's.  Mao Decl., ¶7.  Accordingly, Mulong witnesses will be relevant to the issues of copying and willfulness.  Importantly, Moonton and Mulong are separate entities.  *Id*.  Moonton owns 20% of Mulong and the two entities share a building.  *Id.*  But the companies have different employees, and separate finance and staffing departments.  *Id.*  All of Mulong's employees are in China, and Moonton has no control or authority over them.  *Id.*, ¶¶7, 10.

Elex, the distributor of *Magic Rush*, is another key Chinese witness.  One of Moonton's defenses with respect to *Magic Rush* is that all of Moonton's conduct occurred in China, and was therefore outside the scope of U.S. copyright law.  Elex and its employees—who distributed the game in the U.S.—are critical witnesses to that defense.  But those witnesses are in China.  *Id*., ¶ 12.

Finally, Moonton's former employees—and even current employees who do not wish to testify—are beyond this Court's subpoena power.  Indeed, at least two Moonton witnesses with unique knowledge have left the company: Zhang Guanqun (who knows about Moonton's relationship with Elex), and Lv Junewi (who knows about Moonton's server operations prior to August 2017).  *Id*., ¶¶ 23–24.

Notably, securing even voluntary testimony from Chinese witnesses will be difficult.  China prohibits depositions.  Krishnan Decl., ¶9 & Ex. E; Papageorgiou Decl., ¶¶ 12–13, 15.  Witnesses who wish to provide sworn testimony voluntarily would have to leave the country to do so.  This will deter witness participation.

Documentary evidence is also located in China, and will be either expensive or impossible to obtain through the Hague Convention.  Both witness testimony and

1  documentary evidence from China will require translation.  It will cost at least
2  $500,000 merely to retrieve these documents in compliance with Chinese law, and
3  to translate them.  Krishnan Decl., ¶4; Papageorgiou Decl., ¶21.  Chinese witness
4  testimony will also require translation, with deposition translation costs alone
5  resulting in an $80,000 cost increase.  Krishnan Decl., ¶4.

6  III.   **ARGUMENT**

7  A *forum non conveniens* dismissal is appropriate here for many reasons:

8  - Defendant Moonton is Chinese, and a Chinese company—Tencent—
9    owns 100% of Plaintiff Riot.
10 - Those two Chinese entities—Tencent and Moonton—are litigating the
11   same subject matter in China, where Tencent chose to sue first.
12 - Riot and Tencent are using these separate Chinese and U.S. lawsuits to
13   take inconsistent positions and to seek a double recovery.
14 - Evidence critical to Moonton's defense resides with Chinese third
15   parties, such as Tencent, and is beyond this Court's subpoena power.
16 - Chinese evidence—which will be costly and time-consuming to
17   translate and present here—will predominate the proceedings, and
18   burden the Court, the jury, and the parties.
19 - A judgment in this case could address, at most, a small fraction ███
20   of the alleged infringement, and would not be enforceable in China.
21 - Riot is comfortable suing in China, having filed this same type of
22   action there more than ten times in the last three years.

23 These and other facts drive the *forum non conveniens* factors strongly in
24 favor of dismissal.  Riot should be required to pursue its claims in China.

25 A.    **Legal standard**

26 Federal courts may dismiss a case on the ground of *forum non conveniens*:

27 when an alternative forum has jurisdiction to hear the case, and trial in
   the chosen forum would establish oppressiveness and vexation to a
28 defendant out of all proportion to plaintiff's convenience, or the

10

chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems.

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal quotation marks and alterations omitted). Dismissal "reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Id.* (internal quotation marks omitted). *Forum non conveniens* is valued as a flexible doctrine. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249-250 (1981). "Each case turns on its facts." *Id.* Like any other plaintiff, U.S. nationals alleging violations of U.S. copyright law are subject to *forum non conveniens* dismissal. *Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 701 (9th Cir. 1995).

"The party moving for *forum non conveniens* dismissal must demonstrate two things: (1) the existence of an adequate alternative forum; and (2) that the balance of relevant private and public interest factors favor dismissal." *Creative Tech,* 61 F.3d at 699. The private and public interest factors, respectively, are:

> [**Private factors:**] (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive.
>
> …
>
> [**Public factors:**] (1) local interest in the lawsuit, (2) the court's familiarity with governing law, (3) burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to this forum.

*Globatrac LLC v. JB Squared Ltd.*, Case No. 15-cv-9278-MWF, 2016 WL 9045479 at *4 & *6 (C.D. Cal. 2016) (quoting *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 & 1147 (9th Cir. 2001)). Here, China is an adequate forum and all of the factors favor dismissal (except for two, which are neutral).

## B. Tencent and Riot's litigation conduct confirms that China is an adequate alternative forum.

China is an adequate forum for this litigation. A forum is adequate if the

11

1199898

defendant is amenable to service of process there. *Creative*, 61 F.3d at 701; *see also Lueck*, 236 F.3d at 1143. Moonton is amenable to service in China. That should end the inquiry.

In rare cases, an alternative forum is inadequate if the remedy it offers "is so clearly inadequate or unsatisfactory, that it is no remedy at all." *Id.* (internal quotation marks omitted); *see also Leetsch v. Freedman*, 260 F.3d 1100, 1103 (9th Cir. 2001). This is a high bar. The fact that a forum has less favorable law does not render it inadequate, as that would defeat a *forum non conveniens* dismissal in all forum shopping cases, the opposite of what the doctrine is designed to do. *See id.*; *see also Piper Aircraft*, 454 U.S. at 247 (1981); *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768–69 (9th Cir. 1991).

Here, China is clearly adequate because Riot, via its parent company Tencent, regularly sues in Chinese courts for copyright and trademark infringement relating to *LoL*. Mao Decl., ¶¶18–20 & Exs. C–G. Moreover, Tencent is currently suing Moonton in China for copyright infringement. *Id.*, ¶15 & Ex. A. Additionally, Chinese law provides a remedy for Riot's false designation of origin claim. Papageorgiou Decl., ¶11. China is clearly an adequate forum.

C.      **The private interest factors favor dismissal.**

This Court must balance the parties' private interests to determine whether they weigh in favor of dismissal for *forum non conveniens*. In balancing these interests, courts must consider how the plaintiff and defendant intend to present their respective cases. *Lockman*, 930 F.2d at 769–70.

Litigating in the U.S. would be uniquely prejudicial to Moonton. Riot and its corporate parent are exploiting their respective nationalities to assert inconsistent facts and to seek a double recovery. Evidence that Moonton needs to expose this impropriety and to defend itself resides with Chinese third parties, beyond this Court's reach. As a result, the private interest factors weigh heavily in favor of dismissal.

1. **The first private interest factor—residence of the parties and witnesses—weighs heavily in favor of dismissal.**

The private-interest analysis focuses on third-parties where, as here, the domestic plaintiff and the foreign defendant both prefer to litigate in their respective homes. *See, e.g.*, *Globatrac*, 2016 WL 9045479 at *4. When analyzing the accessibility of evidence and convenience, the "court's focus should not rest on the number of witnesses or quantity of evidence in each locale" but on "the materiality and importance of the anticipated evidence and witnesses' testimony." *Id.* (quoting *Lueck*, 236 F.3d at 1146); *see also Leetsch v. Freedman*, 260 F.3d 1100, 1104–05 (9th Cir. 2001). Here, critical third-party evidence is in China. The most critical third party is Tencent. Both Riot and Tencent claim to have originated game maps that are "virtually identical" to Moonton's—which means that their game maps are also virtually identical to each other. *See supra* § II.B.2. Moreover, the specific visual elements that Riot claims were copied—obstacles, objects, monsters, bases, turrets, textures, and overall color palate—are the same visual elements that Tencent asserts were copied. *Id.* Evidence substantiating Tencent's allegations would help prove various Moonton defenses:

*Lack of originality.* If Tencent originated the asserted visual elements (*e.g.*, monster position, color palate, etc.), then Riot could not have, and Riot would therefore have no valid copyright to assert. 2 Patry on Copyright § 3:28 (2017) ("obviously a copier is not a creator, much less an 'independent' creator.").

*Non-infringement, merger, and scenes à faire.* Each of these three defenses would be bolstered if Tencent and Riot somehow thread the needle and show that each of them independently developed virtually identical game boards without copying each other. First, it would tend to show non-infringement, because Moonton, too, could have developed a "similar"-looking game without copying (*i.e.*, non-infringement). *See Mazer v. Stein*, 347 U.S. 201, 218 (1954) (independent creation as defense to copyright infringement). Second, it would

13

1199898

1   suggest that the basic uncopyrightable rules of the MOBA genre necessitate that
2   MOBA games look a certain way, thereby bolstering Moonton's merger defense.
3   *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994)
4   (merger doctrine applies if the uncopyrightable idea "can only be expressed in so
5   many ways.").   Third, it would bolster Moonton's scenes à faire defense because it
6   would suggest that the games consist of stock visual elements that are common to
7   the MOBA genre.   *See id.* ("[W]hen similar features in a videogame are as a
8   practical matter indispensable, or at least standard, in the treatment of a given idea,
9   they are treated like ideas and are therefore not protected by copyright.").

10      ***Reduced damages.***  If Tencent originated a certain visual element, such as
11  the position of a monster, and if the Chinese court finds that Moonton copied that
12  monster position such that it owes Tencent all profits derived from that visual
13  element, then Moonton should not have to pay Riot any damages associated with
14  that same visual element.  But if the Chinese and American courts each found
15  infringement, Moonton would face an unfair and prejudicial double recovery.

16      To prove these defenses, Moonton would need depositions and document
17  discovery of Tencent's game development process.  But, as discussed below,
18  Moonton has no way to obtain such evidence in this case.

19      Similarly, Mulong is a critical Chinese witness that is unavailable here.  The
20  only time pre-litigation that Riot claimed infringement in Moonton's *Mobile*
21  *Legends* games was in August 2016; but at that time, it was Mulong, not Moonton,
22  that was primarily responsible for game development.  Mulong's engineers and art
23  designers will therefore be critical witnesses on the issue of copying.  To the extent
24  Mulong originated any accused visual element, Moonton would have, at the least, a
25  clear defense to willful infringement.  Indeed, Mulong is so obviously important
26  that, in its Chinese copyright case, Tencent sued both Moonton and Mulong.
27  Nonetheless, Mulong's documents and witness are unavailable here.
28      Elex is another important and unavailable Chinese witness.  Copyright

14

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

1   infringement cannot be based on extraterritorial acts.  *See Subafilms, Ltd. v. MGM-*
2   *Pathe Commc'ns Co.*, 24 F.3d 1088, 1096 (9th Cir. 1994).  With respect to *Magic*
3   *Rush*, while Moonton developed the game in China, Elex distributed it in the
4   United States.  Elex is therefore a witness to Moonton's extraterritoriality defense.

5         Finally, Moonton's own former employees are also unavailable witnesses.
6   Company co-founder Zhang Guanqun is uniquely knowledgeable about Moonton's
7   relationship with Elex, which will be relevant, at least, to Moonton's
8   extraterritoriality defense relating to *Magic Rush* (*i.e.*, that Moonton performed no
9   infringing act within the U.S.).  Mao Decl., ¶23.  Additionally, former engineer Lv
10  Junewi is an engineer uniquely knowledgeable about Moonton's server operations
11  relating to the *Mobile Legends* games prior to August 2017.  *Id.*, ¶24.  His
12  knowledge is therefore also relevant to Moonton's extraterritoriality defense
13  relating to *5v5* (which was only sold in the Brazilian Google Play store).

14        Because these critical witnesses reside in China, the "residence of the parties
15  and witnesses" factor weighs heavily in Moonton's favor.  *See, e.g.*, *Meridian*
16  *Seafood Prods., Inc. v. Fianzas Monterrey, S.A.*, 149 F.Supp.2d 1234, 1239 (S.D.
17  Cal. 2001) (granting dismissal where "most of the witnesses, documents and
18  sources of proof" were located in Mexico, causing "a waste of the parties' limited
19  resources" to require witness travel, and noting "need to translate virtually every
20  document and much of the testimony" into English).

21              **2.**    **The second private interest factor—convenience of the**
                               **forum to the litigants—weighs heavily in favor of dismissal.**
22        Superficially, the second factor might appear to be neutral, because Riot is
23  based in California and Moonton is based in China.  But this case presents a unique
24  fact pattern, because Riot regularly pursues this very type of litigation in China.  In
25  the last three years, Riot, through its Chinese parent, Tencent, has filed at least
26  ***eleven*** copyright and trademark infringement actions relating to *LoL* in China
27  against Chinese defendants.  *See* Mao Decl., ¶¶18–20 & Exs. C–G.  This litigation
28

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1   record reflects that Riot prefers to sue in China, presumably because China has

2   lower litigation costs, quicker case resolution, lower burdens on witnesses, and

3   effective remedies to infringement.  Papageorgiou Decl., ¶¶5, 16, 18–20.

4       Riot's choice to deviate from its playbook and sue Moonton in the U.S.

5   suggests that Riot's goal here is not convenience, but rather to help Tencent

6   increase Moonton's litigation costs, and to allow Riot and Tencent to take

7   inconsistent positions while also seeking a double recovery.  The fact that Riot

8   often sues in China weighs strongly in favor of dismissal.

9       Further, as discussed below, this forum is uniquely inconvenient to Moonton

10  because allowing this case to proceed will prejudice Moonton and expose it to the

11  potential for double recovery.  *See infra* § III.C.7.

12          3.   **The third private interest factor—access to physical
13               evidence and other sources of proof—weighs heavily in favor
               of dismissal.**

14      Allowing this case to proceed in the U.S. would severely prejudice Moonton

15  with respect to document discovery.  Moonton would have to invoke Hague

16  Convention procedures to obtain documents from critical Chinese third parties such

17  as Tencent, Mulong, and Elex.  These procedures are slow and often ineffective.

18  Papageorgiou Decl., ¶ 14.  It can take a year or more to obtain a response, if at all.[8]

19  Accordingly, the third factor also weighs in favor of dismissal.

20          4.   **The fourth private interest factor—whether unwilling
21               witnesses can be compelled to testify—weighs heavily in
               favor of dismissal.**

22      Chinese third parties are beyond this Court's subpoena power.  *See* Fed. R.

23  Civ. P. 45(b)(2) & (3).  They are also beyond the reach of the Hague Convention,

24

---

25  [8] *See* https://travel.state.gov/content/travel/en/legal-
26  considerations/judicial/obtaining-evidence/preparation-letters-rogatory.html;
    *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 542
27  (1987) ("In many situations the Letter of Request procedure authorized by the
    Convention would be unduly time consuming and expensive, as well as less certain
28  to produce needed evidence than direct use of the Federal Rules.").

because China prohibits depositions for foreign litigation.[9]  It is therefore impossible to compel unwilling Chinese witnesses to testify.

The Chinese ban on depositions impedes obtaining testimony even from willing witnesses.  Such witnesses, including current Moonton employees, must leave the convenience and protections of their home country to sit for deposition.  Moreover, while Moonton hopes and expects that its employees will testify voluntarily, the company cannot simply order an employee to leave the country to sit for a foreign deposition under foreign law.  Papageorgiou Decl., ¶13.

In light of the complete inability to compel testimony from unwilling witnesses, this factor, too, weighs heavily in favor of dismissal.[10]

### 5.    The fifth factor—the cost of bringing witnesses to trial— weighs heavily in favor of dismissal.

Moonton will obviously bear significant expense bringing its employees from China to trial, both monetarily and in time away from work.  In light of jet lag, the need to build in time to meet with counsel prior to testifying, and the inability to predict the time at which a witness must testify, Moonton's employees will have to carve out very significant time away from work to participate meaningfully in a U.S. trial.  Riot's employees—who presumably are located locally—face no similar burden: there will be no jet lag, scheduling trial testimony and prep time can be more exact, and they need not build in extra time to deal with language barriers.

As there are no U.S.-style trials in China, Riot would not face analogous burdens were it to pursue its case in China.  Papageorgiou Decl., ¶¶ 19–20.

---

[9] Krishnan Decl., ¶9 & Ex. E (State Dept. guidance); Papageorgiou Decl., ¶12.

[10] *See Lockman*, 930 F.2d at 770 (noting inability to compel witnesses to appear involuntarily in copyright case weighed in favor of dismissal); *Lueck*, 236 F.3d at 1147 ("[B]ecause the district court cannot compel production of much of the New Zealand evidence, whereas the parties control, and therefore can bring, all the United States evidence to New Zealand, the private interest factors weigh in favor of dismissal."); *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 696 (9th Cir. 2009) (even where foreign witness testimony could be obtained this factor weighed in favor of dismissal).

### 6. The sixth factor—the enforceability of the judgment—weighs in favor of dismissal.

Enforcing a U.S. judgment in China is challenging.  Papageorgiou Decl., ¶ 17.  By contrast, enforcement of a Chinese judgment in China is certain.  *Id.*, ¶ 18.  This factor clearly weighs in favor of dismissal.

Related to the enforceability of a judgment is the efficacy of a judgment.  And this case suffers from serious limitations in redressing the infringement that Riot alleges.  Only about ███ of Moonton's revenues for *Bang Bang* are in the U.S.  The remaining ███ flows from overseas distribution that is outside the scope of U.S. copyright law, and that is not recoverable through this lawsuit.  *See Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995) (holding claim for transmission of broadcasting signal to Canada was impermissibly extraterritorial).

By contrast, if this suit were to proceed in China, Riot could pursue 100% of the damages for its purported infringement.  For instance, in its parallel Chinese lawsuit against Moonton, Tencent seeks 100% of damages for worldwide distribution in China.  Mao Decl., Ex. A.  For Riot to redress the entirety of the infringement it alleges, it would need either to bring an additional lawsuit in China (which would be duplicative of this lawsuit) or similar lawsuits in dozens of other countries.  Overall, the inefficiency and inefficacy of a judgment in this lawsuit—compared to one that could be obtained in China—warrants dismissal.

These impediments to the enforceability and effectiveness of a potential U.S. judgment also raise serious questions about Riot's motives for suing Moonton in the U.S., particularly when Riot normally brings these cases in China.

### 7. The seventh factor—all other practical problems that make trial of a case easy, expeditious and inexpensive—weighs strongly in favor of dismissal.

The seventh "catch-all" factor weighs in favor of dismissal for two reasons.  *First*, the pending Chinese proceedings that could lead to a double recovery

and the duplication of efforts favor dismissal.  *See, e.g.*, *Globatrak*, 2016 WL 9045479 at *5 ("Because parallel litigation is pending in England, the duplication of resources as well as risk of inconsistent judgments counsel in favor of dismissing the action.").  Indeed, parallel foreign litigation is often a driving factor in *forum non conveniens* dismissals.[11]  *See Fresh Pac Int'l, Inc. v. Gowan Group*, No. 16-cv-539-GPC, 2016 WL 4563716 at *12 (S.D. Cal. Sept 1, 2016) ("Actions pending in a foreign forum should be taken into account by courts, as the doctrine of *forum non conveniens* was designed in part to avoid these inconveniences.").  If the Chinese court finds that Tencent originated the MOBA game map(s), or visual elements thereof, at issue, then Riot should not be able to claim damages for those same visual elements.  Additionally, Riot and Tencent each advance the factually inconsistent position that Moonton copied its game.  Allowing both cases to proceed in different countries leads to a high likelihood of inconsistent judgments and a certainty that efforts will be duplicated.

*Second*, the language barrier also weighs in favor of dismissal.  Translation is expensive.  Bringing translators to depositions in Asia will significantly increase expense, particularly if Riot seeks extended deposition time for translated testimony.  Krishnan Decl., ¶4.  Document translation will be expensive as well.  Merely translating the twelve short foreign language documents submitted with this motion cost approximately $2,400 and took five days.  *Id.*  Translation expenses and compliance with Chinese "state secret" controls could easily increase expenses by $500,000 to $1 million compared to comparable U.S. litigation.  *Id.*;

---

[11] *See, e.g.*, *Sinochem*, 549 U.S. at 435–36 (ruling that the existence of parallel litigation in New Zealand, where the "gravamen" of the complaint was in New Zealand, made it a "textbook case" dismissal"); *Lockman*, 930 F.2d at 770 ("trying all claims in one case [in Asia] would prevent fragmented litigation "); *Creative Tech.*, 61 F.3d at 701 (affirming dismissal where there was parallel litigation in Singapore); *Sandoval v. Carnival Corp.*, No. 12-5517-FMO, 2014 WL 12585803 at *6, 7, 10 (C.D. Cal. Sept. 15, 2014) ("The avoidance of duplicative proceedings is precisely the sort of 'practical problem' in the adjudication of a case that the doctrine of *forum non conveniens* is designed to avoid.").

19
DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

Papageorgiou Decl., ¶21.  These costs alone would dwarf the estimated $200,000 "all in" cost of litigating the case in China.  Papageorgiou Decl., ¶20.

Translation will also drag out proceedings.  Translated testimony will increase deposition and trial time.  Nuance will be lost in translation.  And credibility determinations are difficult with translated testimony.

Because Chinese proceedings are less expensive and focus less on witness testimony, similar expense and inefficiency would not hinder Chinese litigation in the same way.  Papageorgiou Decl., ¶¶19–20.  This is no doubt why Riot typically prefers to sue Chinese defendants in China.

Accordingly, the seventh factor weighs strongly in favor of dismissal.

### D.      Riot's choice of a U.S. forum receives reduced deference.

In the private interest analysis, the Court must determine the degree of deference to accord Riot's choice of forum.  Here, Riot deserves reduced deference.

While a plaintiff's choice of forum is owed a degree of deference, "[t]he deference due to plaintiffs . . . is far from absolute."  *Lockman*, 930 F.2d at  767.  In practice, "defendants frequently rise to the challenge" of demonstrating cause for a *forum non conveniens* dismissal.  *Id.*  For instance, in *Globatrac v. JB Squared*, this Court dismissed a California plaintiff's lawsuit because, "[e]ven considering the greater deference afforded to a plaintiff's choice of its home forum, the private factors [] strongly favor[ed] dismissal." 2016 WL 9045479 at *6 (internal quotations and alterations omitted); *see also Nai-Chao v. Boeing Co.*, 555 F.Supp. 9, 21 (N.D. Cal. 1982) ("The federal courts have not felt constrained to retain jurisdiction over predominantly foreign cases involving American plaintiffs where an examination of the *Gilbert* factors demonstrated that the action is more appropriately brought in a foreign forum").

Under certain circumstances, courts accord reduced deference to a plaintiff's forum choice.  Two such circumstances apply here.  *First*, Riot appears to have filed this lawsuit in the U.S. for reasons other than convenience.  *Second*, Chinese

20

1199898

interests—not just U.S. interests—are driving this lawsuit.  For these reasons, Riot's forum choice deserves reduced deference.

        1.    **Riot's forum choice receives reduced deference because it was driven by factors other than convenience.**

      Plaintiffs motivated by considerations other than convenience—such as forum shopping—are accorded less deference.  *Vivendi SA v. T–Mobile USA Inc.,* 586 F.3d 689, 695 (9th Cir. 2009).  This is why courts frown upon plaintiffs who have initiated parallel foreign litigation.  *Ranza v. Nike* is illustrative.  793 F.3d 1059, 1076–77 (9th Cir. 2015).  Ranza was an expatriate U.S. citizen who worked for Nike's Dutch subsidiary.  She brought sexual harassment claims against the subsidiary in the Netherlands.  She later brought suit against Nike in the U.S.  In affirming dismissal of the claim against Nike—*i.e.*, a claim by a U.S. citizen against a U.S. citizen—the Ninth Circuit observed that an expatriate citizen "is entitled to less deference because it would be less reasonable to assume the choice of forum is based on convenience."  *Id.*  Moreover, the fact that the plaintiff "unsuccessfully litigated her claims" in the Netherlands and then pursued a remedy in U.S. courts "raises an inference, at least, that she is engaging in forum shopping, which also permits us to defer less to her choice of forum."  *Id.*

Here, Riot's forum choice does not appear to be driven by convenience.  *First*, Riot's conduct is akin to forum shopping in that this forum appears to have been chosen to gain an unfair litigation advantage.  Riot and Tencent claim that they each independently originated virtually the same game map.  They seek a double recovery from the same alleged infringement.  This improper use of the U.S. courts—particularly when Riot sued first in China through its parent—does not warrant any deference.

*Second*, as discussed above, Riot has filed a lawsuit that is not likely to result in a judgment that is enforceable against Moonton in China.

      *Third*, Riot normally sues defendants in China.  Yet here, Riot has sued in a

21

far more expensive jurisdiction without even trying to obtain relief in China.

Because Riot's forum choice was driven by factors other than convenience, that choice deserves reduced deference.  *See, e.g.*, *Facebook, Inc. v. Studivz Ltd.*, No. 08-3468-JF, 2009 WL 1190802 at *2 (N.D. Cal. May 4, 2009) (reduced deference was appropriate where plaintiff was a multinational corporation already litigating a similar action in alternative foreign forum, and the conduct complained of occurred in the foreign forum).

2.     **Riot's forum choice receives reduced deference because its Chinese interests, at least in part, are driving this litigation.**

Foreign plaintiffs receive less deference.  *Piper Aircraft*, 454 U.S. at 255–56. When analyzing the parties' nationalities, courts focus on the parties and interests truly driving the dispute.  For instance, in *Creative Technology v. Aztech Systems* the Ninth Circuit determined that the core dispute was between foreign entities, and disregarded those entities' U.S. subsidiaries.  61 F.3d at 704 ("This is essentially a dispute between two Singapore corporations. . . .  The presence of Aztech Labs, a wholly-owned [U.S.] subsidiary of a Singapore corporation, influences our analysis very little."); *see also Meridian*, 149 F.Supp.2d at 1239 ("Where an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon his citizenship as a talisman against *forum non conveniens* dismissal is diminished.").

Here, the chronology suggests that Riot's parent, Tencent, is playing a significant role behind the scenes of this lawsuit.  Riot stopped complaining about infringement by the *Mobile Legends* games **ten months** before filing the complaint in this case.  *See supra* § II.C.  Copyright owners like Riot do not sit silently for ten months when they suspect infringement.  They complain.  They send cease-and-desist letters.  They sue.  Indeed, Riot made its first (and only) complaint about the *Mobile Legends* game less than a month after the game was released (and it had only been released in Brazil).  *Id.*  But between September 2016 and July 2017,

22

after Moonton made changes to its game, Riot said nothing.  *Id.*  Rather, during that ten-month period, it was ***Tencent***, not Riot, that complained about alleged infringement, negotiated with Moonton, and ultimately sued Moonton with respect to *King's Glory* in March 2017.  *Id.*  It was only four months later that Riot filed this suit.  *Id.*  Four days later, Tencent attempted to use the filing of this suit to persuade Apple to take down Moonton's game.  *See supra* § II.B.1.  This chronology suggests that, starting in September 2016, Riot either abandoned its belief that Moonton's games infringe, or decided to subordinate its infringement claims to those of its Chinese parent, Tencent.  Either way, this chronology suggests that Chinese interests are driving this litigation.

Accordingly, Riot's choice of a U.S. forum deserves reduced deference.

### 3. The balance of private interest factors outweigh any deference to Riot's forum choice.

This Court's *Globatrac* decision is informative in balancing the interests of a domestic plaintiff and a foreign defendant.  There, despite deferring to the plaintiff's forum choice, the Court found that "the private factors . . . strongly favored dismissal."  2016 WL 9045479 at *6.  Here, the fact that Riot is wholly owned by a Chinese parent company, which it is colluding with to bring duplicative and inconsistent litigation, results in even less deference to the plaintiff's forum choice than the plaintiff was entitled to in *Globatrac*.

The private interest factors here weigh strongly in favor of dismissal, and more strongly than they did in *Globatrac*.  This case raises far more acute problems with respect to unavailable evidence, both because of the importance of the unavailable evidence, and because China prohibits depositions.  The potential for a double recovery is far more serious, because it is a third-party, not Riot itself, seeking an inconsistent judgment.  And Riot regularly brings this exact type of lawsuit in China through Tencent—a fact which was not present in *Globatrak*.  Finally, this case presents issues with the unenforceability and inefficacy of the

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

judgment that were not present in *Globatrac*.

For all of these reasons, despite according Riot's forum choice the limited weight that it deserves, the private interest factors weigh so strongly in Moonton's favor that dismissal is the only appropriate course.

E.    **Public Interest Factors**

The five public interest factors either weigh in favor of dismissal or are neutral, thus confirming that dismissal is appropriate here.

1.    **The first public interest factor—local interest in the lawsuit—weighs in favor of dismissal.**

While both China and the U.S. have an interest in this lawsuit, the Chinese interest is greater.  Moonton is based entirely in China, as are Mulong and Elex, which are inextricably bound to the subject matter of this suit because of their roles in the development and distribution of the accused games.  And while Riot is based in the U.S., it is wholly-owned by a Chinese company.  Moreover, ████████ of downloads were in the U.S.  Accordingly, this factor weighs in favor of dismissal.

2.    **The second public interest factor—the court's familiarity with governing law—either is neutral or weighs in favor of dismissal.**

The second public interest factor is neutral, so long as Riot makes clear that it is not pursuing damages in this case for non-U.S. downloads.  To the extent Riot purports to seek recovery for a download outside of the U.S., that nation's law would govern the claim.  *See Allarcom*, 69 F.3d at 387 (holding that a copyright claim for sending a broadcast signal to Canada was impermissibly extraterritorial).

3.    **The third public interest factor—the burden on local courts and juries—weighs in favor of dismissal.**

The "burden on local courts and juries" factor favors of dismissal.  Tencent has a related claim pending in China, and that Chinese court could more easily decide this overlapping case.

Further, this litigation poses a significant, unnecessary burden on the Court and the jury.  This Court and the jury will have to untangle Tencent and Riot's

24

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

1  inconsistent positions, including which of Tencent and Riot originated each

2  asserted element.  Alternatively, this Court and potentially the jury might have to

3  decide how to reduce Riot's damages based on a Chinese judgment in Tencent's

4  favor.  Further, any trial would involve translated testimony and documents, as the

5  key witnesses and evidence will be Chinese.  These problems would not arise if

6  Riot were forced to proceed in China alongside its corporate parent.

7          4.      **The fourth pubic interest factor—congestion in the court—weighs in favor of dismissal.**

8

9  If Riot were to pursue its claim in China with Tencent as its licensee—as it

10 has done many times before—it would have a first-instance ruling on the merits

11 within approximately one year, compared to a 19.3 month time-to-trial for this

12 Court.  Papageorgiou Decl., ¶ 5; *Globatrac*, 2016 WL 9045479 at *6; *Gates Learjet*

13 *Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984) ("The real issue is not

14 whether a dismissal will reduce a court's congestion but whether a trial may be

15 speedier in another court because of its less crowded docket.").  This factor, too,

16 weighs in favor of dismissal.

17         5.      **The fifth public interest factor—the costs of resolving a dispute unrelated to the forum—is neutral.**

18 The factor is neutral as this lawsuit relates to both the U.S. and China.  *See*

19 *Globatrac*, 2016 WL 9045479 at *6.

20

21 IV.   **CONCLUSION**

22 For the foregoing reasons, Moonton respectfully requests that the Court

23 dismiss Riot's claims based on *forum non conveniens*.  At the very least, Moonton

24 respectfully requests that the Court stay Riot's claims pending: (1) the final

25 resolution of Tencent's copyright lawsuit in China, and (2) the conclusion of any

26 efforts by Riot to pursue its claims in China.

27

28

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS PURSUANT TO
THE DOCTRINE OF FORUM NON CONVENIENS, OR, IN THE ALTERNATIVE, TO STAY
Case No. 2:17-cv-4986 MWF (SS$_X$)

1199898

1

2
Dated:  October 27, 2017

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

By:    /s/ *Ajay S. Krishnan*
AJAY S. KRISHNAN
MICHAEL S. KWUN
KHARI J. TILLERY
EDUARDO E. SANTACANA

Attorneys for Defendant SHANGHAI
MOONTON TECHNOLOGY CO.,
LTD

26

1199898